[Crim. No. 4709. Second Dist., Div. One. Feb. 13, 1952.]

THE PEOPLE, Respondent, v. BRUCE H. TOMPKINS, Appellant.

Joseph T. Forno for Appellant.

Edmund G. Brown, Attorney General, and William E. Fitzpatrick, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County defendant was accused in Count I of violating subdivision 1, section 337a of the Penal Code. Count II charged a violation of subdivision 3 of the same code section, while in Count III defendant was charged with a violation of subdivision 6 of the aforesaid Penal Code section.

Following the entry of pleas of not guilty, a jury was waived, and the cause proceeded to trial before the court, resulting in the acquittal of defendant on Counts I and III and conviction of the offense charged in Count II. A motion for a new trial was denied, judgment was pronounced, execution thereof suspended, and defendant granted conditional probation.

Defendant appeals from the judgment, verdict and sentence, and from the denial of his motion for a new trial.

The attempted appeal from the verdict and sentence must be dismissed for the reason that there is no such appeal known to our law (*People* v. *Clark,* 106 Cal.App.2d 271, 273 [235 P.2d 56]; *People* v. *D'Elia,* 73 Cal.App.2d 764, 766 [167 P.2d 253]; *People* v. *Rose,* 26 Cal.App.2d 513, 519 [79 P.2d 737]).

A review of the record discloses the following as a fair epitome of the testimony which gave rise to this prosecution. On March 3, 1951, Officer Joel Clark, attached to the vice detail of the Los Angeles Police Department, had occasion to observe the movements of defendant between the hours of 11:30 a. m. and 12:30 p. m. After following defendant in an automobile, during which time the defendant drove around the block three or four times, the officer observed him park in front of a market at 10425 Glenoaks Boulevard. The police officer thereupon stopped and parked his car opposite one side of the market. He observed defendant enter the store and walk up to a man later identified as Roy Beanblossom. The latter held a short conversation with defendant outside the hearing of the officer. Following the conversation defendant and Beanblossom walked out of the store through the front door. They stopped and held another conversation on the sidewalk. The officer approached the men and saw Beanblossom hand defendant a slip of paper.

Thereupon defendant was seen handing Beanblossom what appeared to the officer to be a $5.00 bill, saying, "I think that is what I owe you, isn't it?" Beanblossom replied, "Yes, I believe it is. *I was a little confused about which horse I bet on yesterday, but I think that is correct.*" Thereupon Beanblossom put the $5.00 bill in his pocket.

At that time the officer exhibited his badge to the defendant and Beanblossom and at the same time removed two pieces of paper from the defendant's right hand. One piece of paper found in defendant's hand was a copy of the National

Scratch Sheet, a publication listing horses running in the various races and predicting the odds on such horses.

At the trial, the officer, after being qualified as an expert on betting methods and paraphernalia utilized by bookmakers in Los Angeles County, identified the other piece of paper found in defendant's hand as a betting marker. A number of sheets of paper taken from the defendant's coat pocket were described by the officer as "owe" sheets and "betting markers." The officer described the use of the "owe" sheets as follows: He termed the sheet as a written memorandum of a wager or wagers made on horse races. That noted on the "owe" sheet would be "the amount of money bet, the manner in which it is to be bet, the horse it is bet on; and at the end of the day the amount of money won or lost." The officer also interpreted certain numbers on the betting markers as indicating the number of races, the horses' handicap number, and the number bet on each place position. There were names or symbols at the top of each betting marker.

After recovering the aforesaid papers from defendant he and Beanblossom were taken to the former's automobile. There, the defendant in conversation with the officer stated he was taking bets out to the racetrack for Mr. Beanblossom's brother to bet for him in the pari-mutuel system. Defendant stated that the "owe" sheets were a record of bets made for friends while he was at the track. He stated that the sheets were tabulated by his wife on an adding machine. Defendant identified the names at the top of the "owe" sheets as "Tommy," being a person who ran a newsstand in the San Fernando section of Los Angeles, and "Mrs. Fenny" as a friend of his. Another "owe" sheet had "No. 10" at the top, and another had the word "Empire." These, defendant contended, he was unable to identify.

A portion of the foregoing conversation was corroborated by Officer Foster.

One of the betting markers had the name "Beanblossom" at the bottom of it and contained a list of horses which the officer testified were entered in races held on the day of the arrest.

Roy L. Beanblossom testified that he and defendant had business dealings of a mercantile nature and that the aforesaid $5.00 which the officer saw defendant hand Beanblossom was for groceries purchased by the former from the latter and to correct an overcharge. He denied having a conversation with defendant regarding horses.

Defendant as a witness in his own behalf testified that he was in the business of selling office supplies and had been so engaged for something over six months. He corroborated Roy Beanblossom's explanation of the conversation and the exchange of the $5.00 bill. He admitted having one betting marker in his possession, the same being the one which bore the name "Ben" on it, and also admitted having the National Scratch Sheet in his possession. He denied that he had ever seen the other betting markers and "owe" sheets which the officer testified were found in his coat pocket. Defendant explained the betting marker with Beanblossom's name on it as being used to indicate bets which Floyd Beanblossom, a brother of the aforesaid Beanblossom, had asked him to make at the track. He stated that Floyd Beanblossom had told him the night before that he was going to leave money with the cashier of the store for defendant to pick up and bet on behalf of Floyd Beanblossom while defendant was at the track. He stated further that the cashier at the market had given him $36 or $37 to bet on behalf of Floyd Beanblossom.

The memorandum which accompanied the money, previously referred to as a betting marker with Beanblossom's name on it, totalled $37. Defendant testified that some of the sheets introduced into evidence as betting markers or "owe" sheets were in fact written by him at the request of the arresting officer and that they had been written after he was arrested. He testified that he had around $50 on his person, exclusive of the $36 or $37 he received from the cashier in the grocery store. It appeared, however, at the trial, that defendant had in the neighborhood of $138 in cash on his person. He explained the discrepancy by saying that he carried $50 around as "mad money," which he rarely counted.

Floyd Beanblossom testified that he had left money with the cashier of the grocery store to be bet at the track by defendant and that the slip showing horses to be bet on and the amount of bets was in his handwriting.

He further testified that defendant made these bets for him gratuitously.

Appellant's first contention is that the evidence is insufficient to sustain the judgment of conviction in that "there was no evidence that appellant received, held, or forwarded any money or receipt or memorandum thereof which had

been staked, pledged, bet or wagered upon the outcome of a horse race."

This claim is untenable. ■ While there was a sharp conflict in the evidence as given on the side of the prosecution by police officers and that given by witnesses for the defense, it was within the province of the trial judge to determine which witnesses and what evidence was entitled to credence. ■ It is only where, as a matter of law, there is no substantial legal evidence to support the conviction that a reviewing court may disturb a verdict or decision. ■ Upon an appeal in a criminal case, the appellate tribunal must assume in favor of the finding of the trier of act the existence of every fact reasonably deducible from the evidence, and then determine whether or not the guilt of the accused can be reasonably inferred therefrom (*People v. Rose*, 26 Cal.App.2d 513, 517 [79 P.2d 737]). In the case at bar, the evidence conclusively establishes that appellant in fact did receive and hold money belonging to the witness Floyd Beanblossom and which money was to be bet for Beanblossom within the enclosure of a licensed horserace track.

Although he does not mention section 19595 of the Business and Professions Code (included in the Pari-mutuel Act), appellant apparently seeks to rely upon the provisions thereof to exculpate himself.

The section in question provides that "A wager made inside an inclosure under the pari-mutuel system for a principal who is not within the inclosure shall be considered a wager made within the inclosure for the purpose of this chapter and any activity of the principal in connection with such wager shall not be considered a wager made outside the inclosure."

The assumption that appellant seeks to bring the transaction here in question within the provisions of the aforesaid statute does not however aid him because he failed to make such a showing at his trial. ■ It is not necessary for the prosecution to either allege or prove that a particular transaction does not come within the exception to section 337a of the Penal Code provided for by section 19595 of the Business and Professions Code. If appellant sought to excuse himself from the charge preferred against him by reason of the provisions of the last mentioned section he was required to show such excuse as a matter of defense

(*People* v. *Torrey*, 16 Cal.App.2d 470, 473 [60 P.2d 900]).
This he did not do.

However, under the facts here present such a defense would have been futile. To sustain it would be to permit commercialized gambling conducted away from the race track to flourish. It would permit the solicitation and acceptance of bets in any amount so long as such bets were transmitted or communicated to the track and there placed through the pari-mutuel machine. To hold that section 19595 of the Business and Professions Code immunized the practices of appellant herein would be to ascribe to the Legislature an intent to eliminate most of the protective regulations designed to prohibit widespread commercial gambling on horse races. Before such a legislative intent can be assumed the statute must clearly compel it because, as stated by this court in *In re Goddard*, 24 Cal.App.2d 132, 140 [74 P.2d 818], "The policy of the State toward commercial gambling is clear and unequivocal. A mere superficial reference to the Penal Code reveals that commercial gambling in all its phases has been uniformly condemned for many years. . . . There is nothing in the Horse Racing Act indicating the slightest intention to depart from the public policy of the state condemning commercial gambling. To the contrary, a determination to adhere to such policy is obvious." (See, also, *In re Walker*, 11 Cal.2d 464 [80 P.2d 990, 117 A.L.R. 825].)

That appellant herein was engaged in commercial gambling is amply supported by the evidence and reasonable inferences to be drawn therefrom. The conversation between appellant and the witness Roy Beanblossom shortly before the arrest was made, as related by Officer Clark, could be well termed as typical of a conversation between bookmaker and customer. The fact that appellant was seen to hand Roy Beanblossom a $5.00 bill is a fact which must be considered when taken in conjunction with the conversation testified to by the officer. While it may be urged that in most cases transactions between bookmaker and customer would be characterized by an exchange of money from the latter to the former, it is only reasonable to assume that the customer would win on occasions, and in that event the transfer of money from the bookmaker to the customer would be in order. There is also the fact that a number of "owe" sheets and betting markers were found on appellant's person which may be regarded as a strong indication that he

was engaged in commercial bookmaking rather than in taking an occasional bet to the track for a friend. Furthermore, the betting markers and "owe" sheets were described by Officer Clark as being of the type commonly used in the business of bookmaking in Los Angeles County.

The inference is also fairly deducible from the testimony of Officer Clark that appellant was doing such a volume of betting on behalf of "friends" at the track that it was necessary for appellant's wife to tabulate the sheets containing the record of these bets. In view of the foregoing, the claim that such conduct and actions are within the purview of section 19595 of the Business and Professions Code must be regarded as a mere subterfuge and an attempt to circumvent the established policy of the state against commercial gambling, and is without legal sanction either in the Horse Racing Act as originally adopted or as subsequently amended. With reference to appellant's methods of operation the Supreme Court in *In re Walker*, supra, page 469, had this to say: "Although the stipulation in the instant case does not disclose that petitioner maintained a place of business for his operations, and only one act of soliciting is charged herein, we see no material difference, in so far as the present statute is concerned, between soliciting bets on the street or in a shop, for in each case the acts of the agents take place outside the inclosure."

Appellant's contention that there was no evidence that he received, held or forwarded any money, receipt or memorandum thereof which had been staked, pledged or bet upon the outcome of a horse race cannot be upheld. In a prosecution under subdivision 3 of section 337a of the Penal Code it is not necessary that a definite piece of currency or memorandum thereof be transferred from a bettor to the accused. In *People* v. *Raze*, 91 Cal.App.2d 918, 922 [205 P.2d 1062], a conviction was sustained where the defendant orally accepted and transmitted a bet by telephone, and where the bet was predicated upon a profit made by the bettor on another race, but which was not evidenced by any memorandum or writing.

Finally, appellant urges that the court committed reversible error in admitting into evidence, over his objections, the conversations between him and the arresting officer when no corpus delicti had been shown.

In the case of *People* v. *Raze*, supra, page 921, the court had under consideration an appeal from a conviction for

violation of subdivision 3, section 337a of the Penal Code, which is the identical offense charged herein and now engaging our attention. In disposing of the contention that the corpus delicti must be proved by evidence other than the extrajudicial declarations of the appellant, Mr. Justice Vallée, speaking for the court, said, ''Proof of the corpus delicti (that the specific offense charged has actually been committed by somebody) should be made prior to the presentation of evidence of admissions or confessions. The pronouncement found in some of the cases that the corpus delicti cannot be established by the extrajudicial statements and declarations of the accused is not an accurate statement of the rule. The rule is limited to admissions and confessions (8 Cal.Jur. § 248, p. 167). Where the gist or essence of the offense charged consists of statements or declarations of the accused,—that is, where statements or declarations of the accused are essential in order to establish that the specific offense charged was committed,—such statements and declarations are admissible as proof of the corpus delicti. There are many criminal offenses predicated upon fraud, such as false pretenses by fraudulent representations (now called theft in this state, Pen Code, § 484), in which the corpus delicti obviously cannot be established without proof of statements or declarations of the accused.''

There is no question but that slight proof is all that is necessary to justify the admission of confessions and admissions. ''To authorize the reception and consideration by the jury of an extrajudicial confession or admission of a defendant, the people need not establish the corpus delicti by proof of the clear and convincing character required to support a conviction. It is sufficient if there is some proof, or prima facie proof, or even slight proof of the corpus delicti'' (8 Cal.Jur. p. 235, § 303. See, also, *People* v. *Hudson,* 139 Cal.App. 543 [34 P.2d 741]).

There is in the record evidence that at the time Officer Clark testified as to his conversations with appellant, it had been previously established by the officer's testimony that money had passed from Beanblossom to appellant; that the latter had a National Scratch Sheet in his hand at the time, and had upon his person numerous items of betting paraphernalia.

Viewed in the light of the rules above referred to, it is manifest there was no error committed in allowing into evi-

dence extrajudicial declarations, admissions or confessions of appellant.

The attempted appeal from the verdict and sentence is dismissed. The judgment and the order denying defendant's motion for a new trial are, and each is affirmed.

Doran, J., and Drapeau, J., concurred.